20667, Cristain v. Hunter Bldgs, and we'll hear from Ms. Hanson. May it please the Court. I'm Jackie Hanson. I'm here for Appellant Luis Cristain. This is a case appealing a judgment as a matter of law that was granted in a trial case in which there were two claims that were presented. The first was an ADEA claim, an age discrimination claim, and the second was a workers' comp retaliation claim that was presented in that same case. And it's only the comp retaliation because the other one you all lost with the jury. That's correct, Your Honor. This case, the JMOL was granted after the presentation of all of the evidence of both of the parties, again, just on the workers' compensation retaliation claim. Just for what it's worth, I would never do that as a trial judge. Just give it to the jury. It was a bit of a surprise. It feels easier after that. And it's important to remember that in this case, this is not one of those cases where the motion for summary judgment had been submitted to the court, not heard or ruled on, and then was just carried with trial. This case had a fully developed motion for summary judgment phase that was considered by Judge Lee Rosenthal. She ruled on the motion in a 12-page opinion and denied the motion with regard to both claims. Six weeks later, we found ourselves in front of Judge Hittner in picking a jury in this case. And, of course, as the Court knows, a judgment as a matter of law should only be granted if the evidence is — if the facts and inferences point so strongly and overwhelmingly in movement's favor that reasonable jurors could not reach a contrary conclusion. In this case, there was significant evidence in favor of the plaintiff, the non-movement, that would have prohibited summary judgment. She's— Kagan. Other than the proximity in time, walk us through what you think is the best evidence to show retaliation. Certainly, Your Honor. And I'll start, if I may, with the Casares factors, the Continental Coffee. That's kind of the easiest way to walk through it. That is not an exhaustive list, but I'll start there. First of all, knowledge of claim by the decisionmaker. The only person who was presented by Hunter Buildings to testify was the decisionmaker, Kevin Edmonds. He is the person who made all of the decisions with regard to this case, from changing the position that Mr. Kristine was working in, giving him new assignments, assessing all of the disciplinary action that happened. Isn't he the one that drove him around everywhere? That's correct. He is the person who picked him up in the morning, drove him home at night, and shepherded him to his doctor's appointments. The expression of a negative attitude toward the injury, this is a matter of — this is a decision based on credibility that only the jury could decide. Mr. Kristine states that during those trips, Mr. Edmonds expressed negative attitude toward the injury. Another witness indicated that when Mr. Edmonds was speaking with her and she asked that Mr. Kristine be allowed to go see a different doctor, that Mr. Edmonds told her essentially, butt out or I'm going to bring legal action against you. There are multiple pieces in the record, multiple pieces of testimony, which Mr. Edmonds of course denies, that indicate a negative attitude. Next is the failure to adhere to the company's established practices. Hunter has a five-step disciplinary process, progressive disciplinary process, that was not followed in this case. But they don't have to. They don't. Of course they have the catch-all that says that in certain circumstances we can deviate from this plan to the extent necessary, including going straight to termination. Why isn't, like, yelling at your boss and just getting in this, like, massive fight with your boss something that you would get fired on? Certainly if that happened, I can see that that would be something to be fired over. However, that is Mr. Kristine denied that that happened. Second, to the extent that he even got frustrated with his boss and he said that he did not yell, but he did express frustration, that was after he had been told that he was being terminated, which also doesn't make it okay to go crazy. So it's who you believe. In other words, if you believe Edmonds, then he was out of control and fireable. But if you believe Kristine? It's Kristine, yes. If you believe Kristine, then he was fired and then expressed, like, why am I being fired, in frustration, but he had already been fired, and he says he didn't shout, he just was upset. That's correct, Your Honor. Okay. Again, it's a jury question. I'm sorry? It's a jury question. It's a credibility issue. That's correct. Moving down to the discriminatory treatment of the injured worker as compared to others, this always feels a bit circular to me. We're claiming that the dismissal was a discriminatory or retaliatory act. And finally, the evidence that the stated reason for discharge was false. There is significant evidence with regard to this element, or I don't want to call it an element, this point, that the reasons that were given throughout this case morphed sometimes to greater degrees, sometimes to lesser. In the beginning, on February 20th, 2015, the termination document that was created in this case indicated a safety violation was the reason for termination. Later in his EEOC statement, position statement, Mr. Edmonds doubled down on that and said that the statement correctly reflected those reasons. At trial, in his affidavit in support of summary judgment, Mr. Edmonds, let me back up, in the affidavit, he waffled a bit. At trial, he explicitly stated that, no, the reasons for termination were not in that document. That alone is a shifting pretext or at least a deviation from their own reasons given that could give rise to an inference that they were fabricating. Also, if we Mr. Edmonds discussed the dangers of injuries to his own job, that injuries could adversely affect the clients, the number of clients that they could get. It could adversely affect his own job in his reporting. Now, initially, he tried to say that none of this would affect him. He was not responsible for safety. Whatever happened at the company happened, and the worst thing he could do would be not show up for work. That was literally his testimony. Later on, he did admit, however, that these reportable accidents could adversely affect him. He also stated that among the elements that create a reportable accident are a modification of job duties and time off of work and, of course, medical treatment. We have evidence in the record that indicates that he did everything he could to minimize the medical treatment and certainly to control the medical treatment, that he asked Mr. Kristine not to miss work even the day after his accident. He admits to that. And finally, he created a job for Mr. Kristine that he did not run through HR. There is no documentation of this. He admitted in the record that he did it without the involvement of HR. And all of this has the illusion or the impression of brushing this under the rug to avoid a reportable accident. All of these, the insistence that Mr. Kristine be at work despite testimony that there was really nothing pressing for him to do, none of these things make sense. Then you have just the bizarre elements, which, as Judge Hayes, you mentioned, him driving Mr. Kristine to and from work, driving him to and from the doctor's appointments, showing up at his house on a Sunday unannounced. These all lend, definitely would give rise to an inference that there is something more going on here than a legitimate termination. The district judge not give any reasons for granting the motion? He did not. And, in fact, when defense counsel moved for the motion, the half, essentially, when plaintiff rested, he stated he didn't expect that he would be granting the motion, that we had made our record, and if he did look like he would grant the motion later on, he would give us an opportunity to argue. When we came back and defense counsel renewed the motion at the end of the trial, the judge said, okay, you've made your record, move on to punitive damages, and then seemed to reverse course. I, frankly, was caught off guard. We moved on to other matters, and I came back and said, Your Honor, could we have a reason so that we might be able to correct the mistake? This is a paraphrase. And he asked, do you agree that Texas law controls? And, of course, I did. And he said that my objection to his granting the judgment was overruled. And he said he would not give me a reason. Oh, maybe he meant Texas law and not having to give a reason. I don't know. Although, that would be procedural, not substantive. There's no telling for that. I may be misremembering this, but was he referring to the Cazares case? Did he make a reference to that case? Frankly, my assumption, since that is the controlling case, my assumption was that he was referring to Continental Coffee v. Cazares. He didn't mention it, and nothing more was mentioned. That's where my mind went immediately when he did say that. But even, again, under the Cazares case, we have those elements and additional elements to support that. In addition to the Continental Coffee elements, we have statistical evidence. We have evidence that 10 of 13 employees claiming injury at Hunter Buildings were terminated within five months of claiming injury. Now, the question that we asked was, provide the names of all employees who claimed injury between 2012 and 2015. We got that information. We asked for their dates of hire, dates of termination, if applicable. And what that reflected, again, is that 10 of the 13 employees did not make it past five months. We also, of course, we do have the temporal process. And they were all controlled by admins? I don't believe that they all were. But he was held actually, I take that back. He testified that as his role, health, safety, security, engineer, he handled all of the workers' comp claims. And so to that degree, just as we— But was he in charge of the firing? I don't know that. I do know that, using Mr. Christine as an example, he did not work under admins when he was injured. He was brought under into Mr. Edmunds' little two-person department, and the determination to fire was then made by Edmunds straight from there. So where does the 13 people come from? They're in the same department? They're in the same—I'm sorry? No, please. They're in the same facility. So Hunter has a number of different facilities, and these are all in the Jacinto Port facility. And finally, the temporal proximity alone is not enough, but we have significant temporal proximity in that he was terminated, I believe, 11 days after the claim was filed, 15 days after the injury itself. All of these elements together, at the very, very least, give rise to or would allow this to go to a jury, and they do not so persuasively weigh in favor of defending that they would support a judgment as a matter of law. And frankly, it's a little bit difficult to argue, because I feel as though I'm giving a closing argument and presenting all of the evidence in support of the claim that we had. But the bottom line is that it just— So you're saying if you had gone to the jury and the jury had ruled in your favor, they wouldn't have been able to set that aside for insufficient evidence. I absolutely do not believe they would have. Again, we have not only the continental coffee factors, the casaras factors, but we have statistical evidence, which we seldom have, and we have the temporal proximity. Every analysis weighs in favor of there being inferences to support the plaintiff's claim in this regard. So the grant, again, I mentioned in the brief that we requested and were entitled to the opportunity to present additional evidence. That actually may be a misstatement. I think if Judge Hittner had provided us with the elements that he felt we had improperly and not sufficiently supported, that I would have actually been able to direct him to evidence that was already in the record at that time. I don't believe there was additional evidence that was necessary. But it maybe fixed it before we had to go through this whole thing. That's correct, Your Honor. And so essentially our argument is that the judgment as a matter of law was improperly granted, that there certainly was sufficient evidence for a reasonable jury to find in favor of the plaintiff, and it's that decision that we appeal. Okay. Thank you. Good morning, Your Honors. Greg Cronenberger for the Appellee Under Buildings and Manufacturing, LLP. I'd like to address this statistical evidence that Ms. Hansen referred to. It's found at the record 1033. It's a table that lists 12 entries of employees. One is actually listed twice, so there are actually 11 employees on the table, and the plaintiff is also on there. So of those employees, three of them are still employed by the company. Three of them either quit or abandoned their jobs, and three of them were not terminated until at least two months after their injury. So that really leaves two employees out of 12 in the last three years that were terminated. I'm going to just tell you that as a young lawyer, I did old law workers' comp in Texas, and I have never seen an employer act like this. I mean, I've seen some pretty weird situations with employers, but to be coming on a Sunday and picking them up and taking them to the doctor and telling them what he can and can't do and all that, oh, my gosh. And doesn't that suggest that Edmonds was just obsessed with this injury, and at least a jury could conclude that? I would submit, Your Honor, that it doesn't. For this, somebody you are obviously thinking that it's unusual. Ms. Hansen thinks it's unusual.  I believe that's a subjective determination. And that's what juries do. I don't know. Juries get to look at Edmonds and look at Chris Stein and say, this is really weird, and that supports because, of course, Edmonds is going to deny violating a law that would subject his company to civil liability, so that's nothing amazing. The question is, is that true? And one thing you look at is this guy acted so strangely, so out of, I mean, it wasn't like they were best buds and he's trying to help them out. He didn't even know the guy, basically, and all of a sudden he's all over him because he's injured. Why isn't that, that plus the temporal proximity, plus his comments, if we believe the evidence most favorable to the non-movement, enough? Our approach is to sort of break them up. We'll put the temporal proximity aside. Let's talk about this idea of the negative attitude. I think that we have to look at it with two things in mind. One is that the employee's subjective belief that this is somehow a negative thing does not really amount to a negative attitude. Negative attitude is you mock the injury. You urge them not to file a report. You increase their working conditions. He did some of that stuff. I mean, he did. He filed the injury. Okay, but he basically tried to, you know, he moved him into this position that didn't even exist. He tried to keep him from, he didn't want him to take the day off. He tried to keep him from medical treatments. He was really trying to control this guy. So what he was trying to do was maybe not prevent any knowledge of the injury but really trying to minimize the injury. And when he didn't succeed in that, he fired him. Why isn't that a fair construction of the evidence that a jury could reach? Go the other way, absolutely. But why couldn't they go that way? Because everything that he did was kind of consistent with the workers' comp law. When the workers' comp law says that one of the policies is to bring workers back as soon as possible, sure, he encouraged them to come back to work the following day. But then when he didn't, when Mr. Christine didn't want to, he said, okay, come back on Monday. You know, he did the new job, which there's no case that says that you have to run a job through HR or anything like that. He built a flow monitor job that he thought was consistent with Mr. Christine's restrictions. And that was the reason he did that. He testified about that uncontradicted. I believe if it's viewed through that lens, you say that he's just doing what he can do. Christine didn't see it that way. And so, I mean, he saw it as because of his language issues and so forth, he used to be put in a position that he was sort of being set up to fail. And so, again, I completely understand. A jury could believe Mr. Edmonds, find him very credible, find Christine to be a liar, all of that. But that's what juries do day in and day out. And I'm just mystified why a judge who's already going to submit something to the jury wouldn't submit this one. Well, I think the judge was persuaded by the evidence as a whole, where what Mr. Christine was saying is, when I got fired, Mr. Edmonds told me that you're old and useless. And that was the thrust, really, of this is the real reason why I got fired. I think it makes sense for the judge to say that is what the plaintiff really believes. There's actually evidence. There's actually evidence that has to go to the jury on that, right? That could never just be dismissed because it's clearly a credibility issue. And so what does the jury believe? I mean, I'm actually not sure what box this argument fits in. But, you know, what did the jury believe? The jury ruled in our favor on the age claim, which means that they believed Mr. Edmonds' story more than they believed Mr. Christine's. On the old and useless, but maybe not on the old the injured and useless. But it was old and useless. I guess what I'm saying. Okay. But what I'm saying, it is not unheard of for a judge to say there's enough evidence here, just, you know, two scintillas. I've said it. And send it, and the jury said, you know, fines for the defendant. That happens every day. So, again, I'm not saying that as a matter of law you lose. I'm just questioning whether as a matter of law you win. Well, again, if we talk about taking each element on its own, you know, argument about the negative attitude is sort of already covered. But let's talk about this other argument about the shifting reasons, okay? If you look at the EEOC statement, look at the affidavit in support of the motion for summary judgment, they are not exactly alike, but they are substantially similar. They all talk about not cooperating with the safety investigation. They talk about him being in the break room. They talk about him being hostile and abusive when he tried to talk to him about safety at the end. And so, you know, they really, they all cover reasons that are legitimate. I think in the fact that he was under the pressure of cross-examination, having to choose one or the other, I think when the case law that says, the case law that says that an employer's reasons don't have to be perfectly articulated. It doesn't mean if you're a little bit sloppy, it doesn't mean that that automatically means that you're liable for discrimination. And the case law, even though the burden-shifting analysis doesn't apply after trial, but the idea that you have to have some evidence that it's false and that the real reason was discrimination, I think those inform the analysis of these allegedly shifting reasons, and they say the reasons that shift, it has to shift towards something that indicates an intent to discriminate. Just because, well, I said it was because he's sleeping in the break room, no, not really. It's because he yelled at me. If those two reasons shift, that's not really raising the kind of an issue that says there could be an intent to discriminate. I don't agree with that. When you keep changing your mind on what the reason is, it means that you're not telling the real reason. That's the inference somebody could draw. In any event, isn't that Texas law? I beg your pardon, Judge? That is Texas law. Which is? What Judge Haynes said, that the changing reasons can be jury questions. Well, changing reasons can give rise to the idea that the reason is false, but the reason also is that the reason has to be false and there has to be some evidence that there is an intent to discriminate. You've got the temporal proximity. You've got all these other. You keep saying, well, let's just treat them separately. Okay. Guess what? We've got to put them together now. And so if it were five years later and he gave a different reason, then maybe say, okay, that doesn't by itself matter. But when you couple that with the weirdness and the temporal proximity and the issues, the other employees, when you put all of that together, isn't that enough at least to get past the, you know, two scintillas or whatever you want to say? Well, the proposition is it's not, Judge. Each one of those things on its own can be explained in a way that does not rise, given any sense of discrimination. Can be. Can be. Well, let me say differently. Maybe I should say. As a matter of law, I don't have to believe Edmonds. I don't have to believe Christine if I'm a juror. I get to look at everybody. Who was sweating? Who was stammering? Who was this? Who was that? What does the document show? And all of that. I mean, that's just, I don't know. That's what juries do. I guess I misspoke when I said can be. I guess what I mean is it doesn't rise to the level. It just doesn't. Even if you take it as true, you apply the analysis that the case requires to apply, and you say, wow, he thought it was weird that Edmonds came to pick him up and take him. But no case says that's wrong. And really that's just a subjective belief. What's your best case for this type of evidence, this type of dispute, not being enough to send a circumstantial evidence case to the jury? Not being enough? Right. Because that's what you're saying. Yes. I guess I'm just saying that if you look at the temporal proximity. In other words, what I'm acknowledging, I'll meet you at least halfway, that this is a multifactor analysis and basically courts just have to draw a line at some point. This is what we're going to send to the jury and below which we're not going to send the jury. What's your sort of best case for setting that standard in terms of comparing to this case? Well, I guess I would – I guess it's easier for me to say what would have been enough. You know, like if there had been – It's a presidential case, like a case that's in the book. Right. Well, I mean – Fight us a case is I think what he's asking. Oh, you're my best – oh, I'm sorry, Your Honor. Thank you. Well, there are several, and there are several for a different prospect, some in the brief and some not. The one for the employee – the employer cannot be liable for carelessly forming their reasons for termination is a Canchola case. That's in the brief. The one that's subjective belief about negative attitude is not adequate. There's a recent case called Avila, Texas Appellate Lexus, 2018 Texas Appellate Lexus 6935. And then there's a Cardenas case, 157 Southwest 3rd 391. Those both stand for that proposition. And then the Green case, Green v. Lowe's, 199 Southwest 3rd 514, not in the brief. I apologize. It stands for two things. One is that when you talk about temporal proximity, it's weeks as opposed to months or years that matters. And the second thing it stands for is the idea that one of the things that – But this is weeks, less than two weeks. Yes, yes. What I meant was because the temporal proximity standing alone is not enough, I was really using that to apply to the statistical evidence and weeding out the statistical evidence down to two people instead of whatever the number is that the plaintiff was arguing. But the other thing it stands for is in that case in Green, the plaintiff was given a modified job duty, complained about the job duty, and then the court used the argument that because the employer does something that they're legally allowed to do, that that doesn't constitute a negative attitude. Those are kind of my best cases, Judge. I think on the Rule 50 motion, if I could address that. Okay. Doesn't Green actually say proximity may establish a causal connection when they are separated by weeks as opposed to months? Yes. So then that would suggest that that by itself may be enough and certainly is a big number which you just need a little plus on top of to get over the hump. I guess we would argue, Judge, that Green has to be viewed in light of Strong, which basically says temporal proximity is not enough. And that's a Fifth Circuit case. Okay. What? Temporal proximity by itself is not enough. I'm sorry. Between Strong and Green, which one was first? Because the Fifth Circuit doesn't get to decide Texas law definitively. If Texas changes its mind or comes up with something subsequently, we have to honor that, right? I can't answer that right now. Okay. I don't know. I mean, so our position is if you take each element, it's not there, and all you're left with is temporal proximity. And under Strong and other cases, it's not enough. But I think we've probably talked enough about that. If I could address the Rule 50 motion. Certainly the record reflects that the district judge didn't allow for an engagement a lot on the elements in the discussion and obviously didn't provide any reasons for his ruling. I guess our position on this is that generally, though, that the appellant knew what the issues were. They knew all the evidence was in had had two opportunities to cross-examine Mr. Edmonds. And I can't conceive of what evidence would have been put in that wasn't already in the record. Perhaps the statistical evidence that the counsel refers to might be part of it. But if that evidence goes into the record, then we have argument about that. And our position is that that doesn't prove anything. And so what could have been done? What would have been done to open the record to allow something to be different? I guess our position is, well, it wasn't perfectly done by the district court. What did happen was both parties were aware of the elements, both parties were aware of the arguments. The appellant was fully heard on the matter and had all opportunity to put forward his case.  I mean, how am I supposed to know what the judge is thinking? I mean, that's the reason why judges give reasons. I know what I think. But that didn't always agree when I was a lawyer. The judge didn't always agree with what I thought. So I needed to be informed on what the judge thought. And here she's mystified, and frankly so am I, as to what the judge was thinking. So it would have been nice to know. That's what she's saying. Which is not your fault. But, you know. But I guess I can understand that, Your Honor, except to say that perhaps the argument is that where's the harm? Well, what could she have done? What else? The record is fully developed from their perspective. And there's nothing that they're claiming they didn't get into the record. And so that's our kind of position on it, even though we recognize that the court did not do the best job of laying out its reasons. I guess I wanted to address quickly. I don't know whether the Court is interested in it. The two factors that we didn't discuss I can briefly address. And one is this idea of failure to follow policies. The progressive discipline policy is not mandatory. It provides for application of the discretion. It says a progressive discipline is not a right. There's no evidence at all that that factor is met. The part about other similarly situated employees being discriminated against there's no evidence at all about any other employee who, you know, was, A, injured and, B, committed the same act but wasn't terminated. I'm sorry, wasn't injured but committed the same act and wasn't terminated. The problem is the same act is really hotly disputed. Like, did he cuss out his boss where you might get fired immediately? Or did he just go, I'm really upset that you're firing me. I don't feel it's justified, which would not be a basis because he'd already been fired. But also wouldn't be a basis to just fire him without the five progressives and all that. I agree with that observation, Your Honor. But there's still no evidence of any other employee. So there's no comparative evidence put into the case at all. So those two factors, in our view, are not met at all. The issues here are a factor. I mean, you've got your temporal proximity, which we have to deal with. And then we have the other two factors, which I think are the negative attitude and the, you know, the evidence that the reason is false. And for those reasons, there are. We concede that fact. And that's another one of those that the courts have said doesn't really matter. It's just something you sort of have to have to get there.  But for these reasons, Your Honor, we submit that the court's decision should be affirmed. Okay. Thank you. Thank you very much. All right. Hanson. Oh, right. Sorry. Thank you. First, I'd like to speak to the point that there's no evidence that anyone had ever been terminated for the same reasons that Mr. Christine was terminated. First, we have to determine which of those reasons we're going to address. So if we start with the using the scaffolding without being trained to do so and having failed to perform a job safety analysis, we asked for any information regarding other people who had been disciplined or terminated, and those are in the interrogatories, and we did not receive any information. We assumed that there was no one. With regard to someone going, essentially just going crazy on Mr. Edmonds, I don't know what else to call it, just losing his temper to the degree that's described, certainly I can imagine that that would be a rare occurrence, and I would understand that there was no one else. However, that was not even addressed in the request either, and remember that that was a reason for termination that only came subsequent. Well, is it an absolute requirement that you show that someone else was fired or not fired having done the same thing but wasn't injured? I mean, isn't that just one aspect of proving any kind of discrimination, retaliation in this whole area? It is. Defendants focus so, with such laser-focusedness, focused, laser focus on the comparators that we always ask for that as an element. The absence of comparators, of course, does not defeat a claim, and it is only one way of showing discrimination. What about his argument that you didn't show, you know, you have these statistics about all these people being fired within a certain amount of time of their injury, but you didn't show us anything about that? How do you respond to that? First of all, I would like to thank Mr. Cronenberg for correcting me. One person is listed twice, so including Plaintiff there are 12. But we asked for, again, the people who had been, who had reported injury between 2012 and 2015. We got that information. We got the information with regard to their termination. In our estimation, that told the story. If there was more to that story, that was certainly within the defendant's rights to present at trial or elsewhere in response to summary judgment or through discovery responses. We got no information on that, and as a result, we certainly didn't go looking for it. We didn't know that there was any more to that story. So if there was a failure of that information, we would submit that was on defendants, if it would have been good for them. With regard to why the jury… But in a civil case, the absence of evidence that the defendant controls and doesn't present, it can be an inference against the defendant. I mean, you can't do that in a criminal case, but you can in a civil. That's certainly my understanding, Your Honor. And finally, with regard to why the jury decided why it did in the age discrimination case, it is not inconceivable that the jury, after having heard an entire trial in which we opened and discussed throughout the presentation of evidence about workers' comp retaliation and how these two occurred simultaneously, how all of the trouble at work started after a workers' comp discrimination claim, and then the jury is presented with a jury charge that mentions only age discrimination and might think, wait a minute, we think that it either concurrently or alone, it was some other triggering factor. Now, both of them, you have to prove that they were determining factors and they can't coincide, but it's not inconceivable that they would find against on the age discrimination claim and for in workers' compensation. More importantly, even informally, we did not get to speak with the jury, so we have no idea what they were thinking when they were back there. But the bottom line is that in this case there was sufficient evidence presented to the jury at the very least to defeat judgment as a matter of law and to allow this case to be presented to the jury. Thank you. MS.